UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRAIG COLLINS,

              Plaintiff,                        Case No. 13-13945

v.

                                        Paul D. Borman

FRANK REWOLD AND SON, INC., AND       United States District Judge
FRANK REWOLD AND SON, INC.
SUPPLEMENTAL RETIREMENT BENEFIT PLAN,

              Defendants.

_____/

OPINION AND ORDER
(1) GRANTING DEFENDANT'S MOTION FOR ENTRY OF JUDGMENT, UPHOLDING
PLAN ADMINISTRATOR'S DECISION (Dkt. No. 6); AND
(2) DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE

      Plaintiff Craig Collins filed this action against Defendants Frank Rewold and Son, Inc.

Supplemental Retirement Benefit Plan (the "Plan") and Frank Rewold and Son, Inc.'s (the

"Company") alleging breach of fiduciary duties and the wrongful denial of benefits under the Plan

in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1054, 1132,

1133, and 1140. Plaintiff's claim arose after Defendants terminated the Plan in 2011 and disbursed

to Plaintiff a single sum lump payment. Plaintiff argues that the decision to terminate the plan and

deny him his full benefits violated ERISA. Plaintiff also alleges a procedural challenge against

Defendants' decisions as Plan sponsor and administrator.

      Now before the Court is Defendants' Motion for Entry of Judgment, Upholding Plan

Administrator's Decision filed on November 22, 2013. (Dkt. No. 6). Plaintiff Craig Collins

responded to this motion after being granted an extension of time on January 3, 2014. (Dkt. No. 10).

Defendants then filed a reply. (Dkt. No. 11).

A hearing on this matter was held on April 24, 2014.  For the following reasons the Court will grant Defendants' Motion for Entry of Judgment, Upholding Plan Administrator's Decision.

## I. BACKGROUND

**A.      The Pertinent Plan Provisions**

Plaintiff, a former employee of the Company, was employed from 1986 through 2012. (Compl. ¶¶ 1-2).  The Company first established the Plan on October 23, 2002.  (Docs. 16-24).[1] Plaintiff became a participant in the Plan on December 19, 2006.  (Compl. ¶ 5, Docs. 38-40, Participation Agreement).  The Plan was amended on December 14, 2006.  (Docs. 26-38).  This amended plan was substantially similar to the original version of the Plan but was adopted to reflect certain changes in the tax code, specifically Code Section 409A.  (Doc. 26).

As set forth in both versions of the Plan, the Company desired "to recognize and reward the contribution of a select group of key employees have made towards the success of the Company, and to assure the Company's ability to obtain and retain the services of such employees."  (Docs. 16, 26 at A).  The Plan expressly set forth in its Recitals that "[t]he Company desires to adopt a plan to provide unfunded supplemental retirement benefits to such key employees, and to provide for family income protection for the family of such employees in the event of such employee's death prior to retirement."  (Docs. 16, 26 at B).  Both versions of the Plan provided that "[t]he Company, or a committee appointed by the board of directors to administer the Plan, shall have full discretion to interpret and administer the Plan."  (Docs. 23, 35).

The Participation Agreement provided that each year on December 31st, the Company would

---

[1] For ease of reference the Court will cite to the "Doc." number which refers to the bates stamp number appearing on each page of the administrative record attached as Exhibit A of the Affidavit of William Moesta.  (*See* Defs.' Mot. Ex. 1, Aff. Moesta).

credit Plaintiff's account under the Plan with the sum of $10,000.00 and would continue to credit his account with a similar amount each year Plaintiff continued to be employed by the Company or until the Plaintiff reached the age of retirement. (Doc. 38, Participant Agreement). It also provided that Plaintiff's account would be credited with interest equal to five and one-half percent (5.5%). (*Id.*). The Participation Agreement made clear that the Company would pay Plaintiff the balance of his account "in one hundred twenty equal or substantially equal monthly installments" payable the first day each month after the occurrence of a qualifying event (death, permanent total disability, or attainment of age 62). (Doc. 39, Secs. 4, 5).

The October 2002 version of the Plan stated that the Company "may amend this Plan in whole or in part at any time prior to commencement of benefits." (Doc. 19, Sec. 5.1). The Plan also stated that the Company could "terminate this Plan at any time before payment of benefits begins." (Doc. 19, Sec. 5.2). The December 2006 version of the Plan similarly provided that "[t]his Plan may be amended in writing by the Company", and stated that "[t]he Company may terminate the Plan or a Participation Agreement." (Doc. 30, Secs. 5.1, 5.2).

The December 2006 version of the Plan stated in a section entitled "Effect of Amendment or Termination", that "[n]o distribution shall be accelerated because of an amendment or termination of the Plan or Participation Agreement. ... No amendment or termination of the Plan or Participation Agreement shall reduce the balance credited to the Participant's Account." (Doc. 30, Sec. 5.3). Both versions of the Plan expressly stated:

> A Participant and his Beneficiary, heirs, successors, and assigns shall have no legal or equitable rights, claims or interests in any specific property or assets of the Company. Neither the Participant, nor his Beneficiary, heirs, successors or assigns shall have any rights, claims or interests in any life insurance policies, annuity contracts, or proceeds therefrom that are owed or may be acquired by the Company ... The Company's assets and polices shall be, and remain, the general, unpledged,

3

unrestricted assets of the Company.  The Company's obligation under this Plan shall be merely that of an unfunded and unsecured promise of the Company to pay money in the future.

(Docs. 19-20, 31-32, Sec. 6.1).

Section 6.9 of the Plan provided a claims procedure applicable when a participant's benefits are wholly or partially denied.  (Docs. 22-23, 34-35).  The claims procedure set forth that a person whose claim has been denied "(1) may request a review upon written application for the Company; (2) may review pertinent documents; and (3) may submit issues and comments in writing."  (*Id.*).

## B.   Termination of the Plan

On April 29, 2011, the Company amended and terminated the Plan effective April 30, 2011. (Doc. 42-43, "Termination Amendment").  The Termination Amendment to the Plan also provided:

2.4 Liquidation of Participant Accounts.  Pursuant to Section 5.4 of the Plan, the present value of the amount credited to the Participant Account shall be distributed to the Participant in a single sum distribution on June 30, 2012.

(Doc. 43).  The Termination Amendment also specified that no employee could become part of the Plan after the Termination date, and also that Participation Agreements between participants and the Company would terminate effective on April 30, 2011.  (Docs. 42-43).

Plaintiff was notified by the Company that the Plan was being terminated on May 9, 2011 by certified letter.  (Doc. 48-55).  The notification included the announcement letter, a Summary of Material Modifications, a fully executed termination amendment, account balance information and a preliminary net present value calculation of the account.  (Doc. 48-55).

The Summary of Material Modifications ("Summary") was "intended to highlight the effect of the termination and liquidation of the [Plan]" and explained that participants would be receiving one lump sum payment on June 30, 2012.  (Doc. 51).  "The single sum will be equal to the present

4

value of your Account Balance taking into account the time period between the distribution date and your Normal Retirement Age." (*Id.*). The Summary also stated that participants became fully vested effective May 1, 2011. Finally, the Summary provided that "[i]f there is a conflict between this summary and the terms of the Plan, the terms of the Plan shall control." (*Id.*).

The account balance information provided with Plaintiff's notification revealed that a whole life insurance policy (the "Policy") held by Northwestern Mutual (identified by Policy number 16 274 116) received the annual contributions for Plaintiff's Plan account. As a result the Policy established a cash balance (labeled "Retirement benefit") of $146,282. (Doc. 54). A "Survivor benefit" was listed as $258,736. (*Id.*).

On July 3, 2012, the Company sent Plaintiff "a check for net present value of the benefits less applicable tax withholdings and a release form." (Doc. 61). The letter also reminded Plaintiff that "you are receiving a lump sum benefit that is the actuarial equivalent of the payment that you, the participant, would have otherwise received." (*Id.*). The check was for a total amount of $57,705.12 and withheld $34,848.13 for federal and state taxes (for a total of $92,553.25). (Doc. 63).

## C.     Denial of Plaintiff's Claim and Appeal

On August 6, 2012, Plaintiff's attorney contacted the Company and claimed that he should have been paid a single lump sum totaling the stated benefit of $146,281.50. (Docs. 66-68). Plaintiff also requested certain documents including all documents regarding the Policy or correspondence regarding the establishment of the Policy or any other any other account, plan, or contract that the Company made payments or contributions to for or on behalf of Plaintiff or other Plan participant. (Doc. 67-68).

5

After receiving Plaintiff's claim, and pursuant to Section 6.9 of the Plan, the Company formed an Initial Claims Review Committee ("Review Committee") which consisted of Taryn Firosz and William Korte to review Plaintiff's claim. (Docs. 70-71). The resolutions appointing the Review Committee also explicitly provided: (1) that "all power and authority" to administer the Plan was delegated to the Review Committee; (2) the members were held harmless for any damages or losses that might arise from their positions; and (3) the Company would take no "adverse job action against" the members for their decisions. (Doc. 70).

Plaintiff's claim was denied one week later on October 31, 2012. (Docs. 73-76, Claim Denial Letter). The Claim Denial Letter did not address Plaintiff's request for documents regarding the Policy.

On November 27, 2012, Plaintiff submitted an appeal of the Review Committee's denial. (Doc. 78). Plaintiff argued in his appeal that the Review Committee had ignored Section 5.3 of the Plan which prohibited terminations or amendments that caused reductions in the balance of the participant's account. (*Id.*). Plaintiff further argued that the Plan Amendment was the product of a conflict of interest and was arbitrary and capricious because it had resulted in the Company directly benefitting from the change in the payment valuation method. (Docs. 78-79). Plaintiff also repeated the request for certain documents relating to the Policy. (Docs. 79-80).

On January 23, 2013, the Company notified Plaintiff's attorney that it needed additional time to review Plaintiff's appeal and provided Plaintiff the opportunity to present any additional evidence. (Doc. 82). Then, on March 12, 2013, and pursuant to Section 6.9 of the Plan, the Company appointed two different employees to serve on the Appeal Committee, William Moesta and Paul Weisenbach. (Doc. 84). The resolution appointing the Appeal Committee also provided the same

provisions of the previous resolution appointing the Review Committee set forth *supra*.  On March 22, 2013, the Appeal Committee issued a Final Letter denying Plaintiff's claim.  (Doc. 1-14).  The Final Letter also stated that Plaintiff was in possession of the pertinent documents as illustrated by the fact he had referenced them in his claim and appeal.  The Final Letter explained that any other documents Plaintiff sought were not pertinent because (1) those documents had no bearing on the provisions of the Plan or the Termination Amendment, or (2) those documents "relate to assets of the Plan Sponsor which the Claimant has no right title or interest in or which would be protected by privilege."  (Docs. 12-13, footnote citing Section 6.1 of the Plan omitted).  After receiving the Final Letter, Plaintiff filed an action in this Court.  (Dkt. No. 1, Compl.).

## II. STANDARD OF REVIEW

A participant or a beneficiary of a ERISA qualified plan may bring an action in federal court to recover benefits pursuant to the terms of the plan.  *See* 29 U.S.C. § 1132(a)(1)(B).  Generally, a court reviews an administrator's decision to deny benefits under an ERISA qualified plan *de novo*. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  However, when a plan such as the one at issue in this action, vests the administrator with complete discretion in making eligibility decisions, a court must apply an arbitrary and capricious standard.[2]  *Id.*

When applying the arbitrary and capricious standard, a court must decide "whether the plan administrator's decision was rational in light of the plan's provisions.  Stated differently, when it

---

[2]  The parties agree that this Plan is subject to the arbitrary and capricious standard of review.  Further, as previously identified, both versions of the Plan (2002 and 2006) provided that "[t]he Company, or a committee appointed by the board of directors to administer the Plan, shall have full discretion to interpret and administer the Plan."  (Docs. 23, 35).

is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000) (internal citations and quotation marks omitted). The United States Court of Appeals for the Sixth Circuit has observed that the arbitrary and capricious standard "is the least demanding form of judicial review of administrative action." *Id.* However, this standard is not "inconsequential" or without any teeth. *Moon*, 405 F.3d at 379. "While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decision." *Id., see also Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006).

When a court is reviewing a plan administrator's decision it must also consider any potential conflicts of interest that exist, such as when the sponsor of the plan is also the plan administrator. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111-12. The Supreme Court has instructed that a conflict of interest is just "*a* 'factor in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (quoting Restatement (Second) of Trust § 187, Comment d) (emphasis added). The existence of this conflict of interest does not change the standard of review. *Glenn*, 554 U.S. at 116-17. The Court will examine this issue more extensively, *infra*, as Plaintiff in this action claims a conflict of interest exists such that the Court should overturn the plan administrator's decisions.

Finally, when evaluating a claim for benefits, a court is constrained to considering the administrative record as it existed when the final decision of the administrator was issued. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 615 (6th Cir. 1998).

## III. ANALYSIS

8

A.    **Count I, Breach of Fiduciary Duties**

Plaintiff claims in Count I that Defendants breached their fiduciary duties, as provided under ERISA, 29 U.S.C. § 1132(a)(2), by amending and terminating the Plan and liquidating Plaintiff's account in a manner that "resulted in a windfall cash payment to the Company." (Compl. ¶ 25). Plaintiff also asserts that Defendants breached these same fiduciary duties by failing to provide Plaintiff with the pertinent documents he requested in connection with the Policy and refused to include those documents in the administrative record. (Compl. ¶¶ 27-29).

It is clear that when a plan is "unfunded and is maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees", neither the participation and vesting provisions of ERISA apply, nor do the fiduciary responsibility provisions. 29 U.S.C. §§ 1101(a)(1), 1051(2). In this action, there is no dispute that both the 2002 and 2006 versions of the Plan explicitly provided that "[t]he Company's obligation under this Plan shall be merely that of an unfunded and unsecured promise of the Company to pay more money in the future." (Docs. 20, 32). Further, Plaintiff does not dispute that both the 2002 and 2006 Plans stated in the recitals that the "Company desires to adopt a plan to provide unfunded supplemental retirement benefits" to "reward the contribution of a select group of key employees". (Docs. 16, 26, Recitals A, B).

Plaintiff argues that despite the Defendants' clear intention of creating an unfunded plan, it actually did fund the Plan by funding Plaintiff's benefits through a whole life insurance policy which carried a cash balance. Plaintiff maintains that because the Policy carried a cash balance, was identified as a "retirement account" in Plan Statements, the Policy was a *res* separate from the Company's general assets. Plaintiff contends that the Eight Circuit's decision in *Dependahl v.*

9

*Falstaff Brewing Corp.*, 653 F.2d 1208 (8th Cir. 1981) is persuasive on the issue.

In *Dependahl*, a company purchased whole life insurance plans on approximately a dozen of its high ranking executives and under the terms of the benefit plan "the named beneficiaries of a covered executive [were] to receive annuity income benefits upon the executive's death, with [the company] recovering the annual premiums previously paid, with interest." *Id*. at 1213-14. In *Dependahl*, the Eighth Circuit reasoned that

> [f]unding implies the existence of a res separate from the ordinary assets of the corporation. All whole-life insurance policies which have a cash value with premiums paid in part by corporate contributions to an insurance firm are funded plans. The employee may look to a res separate from the corporation in the event the contingency occurs which triggers the liability of the plan.

*Id*. at 1214.

First, the Court recognizes as an initial matter that the Eighth Circuit's holding in *Dependahl* is neither binding nor controlling upon this Court. Second, the Court finds *Dependahl* is factually inapposite to the Plan provisions in this case and therefore not persuasive. As the Defendants' accurately note, the Eighth Circuit itself has differentiated *Dependahl* from benefit plans like the one at issue in this action. *See Belsky v. First National Life Ins. Co.*, 818 F.2d 661, 663 (8th Cir. 1987).

In *Belsky*, the Eighth Circuit held that a benefits plan for select employees, under which the employer bank purchased individual life insurance policies for those employees to cover the cost of the benefits, was not a "funded" plan under ERISA. *Id*. at 662-63. The *Belsky* Court examined the *Dependahl* decision at length and found that "the Bank's plan so differs from the one in *Dependahl* that *Dependahl* is not controlling." *Id*. at 664. Indeed, the Eighth Circuit noted several relevant factual differences between *Dependahl* and the plan in *Belsky*: (1) the *Belsky* plan provided for disability and retirement benefits - not just death benefits as in *Dependahl*; and (2) the language

10

of the *Belsky* plan "specifically avoid[ed] making a direct tie between the insurance policy and the Plan" and stated that any policy would "remain, a general, unpledged, unrestricted asset of the Bank." *Belsky*, 818 F.2d at 663.

These two relevant factual distinctions are present in the current action. The instant Plan provided retirement and total disability benefits to Plaintiff in addition to death benefits. Further, just like the plan in *Belsky*, the Plan in this action did not tie the Policy to the Plan but provided:

> [n]either the Participant, nor his Beneficiary [] shall have any rights, claims or interests in any life insurance policies, [] or proceeds therefrom that are owed or may be acquired by the Company. Such policies or other assets of the Company shall not be held under any trust from the benefit of the Participant, [] as collateral security for the performance of the obligations of the Company under this Plan. The Company's assets and polices shall be, and remain, the general, unpledged, unrestricted assets of the Company."[3]

(Docs. 31-32). Therefore, unlike *Dependahl*, this Plan maintained that "the cash value of the policy simply became a general, unpledged, unrestricted asset" of the Company and those general assets, and not the Policy, would be used to fund the Plan. *Belsky*, 818 F.2d at 663.

---

[3] Section 6.1 states in its entirety:

A Participant and his Beneficiary, heirs, successors, and assigns shall have no legal or equitable rights, claims or interests in any specific property or assets of the Company. Neither the Participant, nor his Beneficiary, heirs, successors or assigns shall have any rights, claims or interests in any life insurance policies, annuity contracts, or proceeds therefrom that are owed or may be acquired by the Company. Such policies or other assets of the Company shall not be held under any trust from the benefit of the Participant, his beneficiary, heir, successors, or assigns, or held in any way, as collateral security for the performance of the obligations of the Company under this Plan. The Company's assets and polices shall be, and remain, the general, unpledged, unrestricted assets of the Company. The Company's obligation under this Plan shall be merely that of an unfunded and unsecured promise of the Company to pay money in the future.

(Doc. 20).

11

Given the clear factual differences between *Dependahl* and the current action, the Court finds that the Plan is an "unfunded" plan pursuant to ERISA. Therefore, the fiduciary responsibilities provisions under ERISA are inapplicable to this action and Plaintiff's Count I is without merit.

**B.     Count II, Denial of Benefits and Termination Amendment**

In Count II, Plaintiff claims that Defendants' decision to terminate the Plan was arbitrary and capricious and resulted in Plaintiff being wrongfully denied benefits in violation of ERISA. *See* Compl. ¶¶ 39-45; 29 U.S.C. § 1132(a)(1)(B). In support of this claim, Plaintiff appears to make two arguments: first, that the Termination Amendment was arbitrary and capricious because it had the effect of accelerating the distribution and/or reducing the amount of Plaintiff's benefits by distributing to Plaintiff the net present value ("NPV") of his account rather than the actual cash balance.[4] Second, Plaintiff argues the Termination Amendment was the product of a conflict of interest and is invalid because it benefitted the Company at the expense of Plaintiff. (Pl.'s Resp. 11-12).

The Court recognizes that Defendants had the right to amend and terminate the Plan at any time. (Doc. 30, Sec. 5.1, 5.2). Further, the 2006 Version of the Plan provided that in certain circumstances "if the Plan and Participation Agreements terminate [] the Company may distribute the amounts credited to the Participation Accounts, determined as of the date of the termination of

_____

[4] Although Plaintiff's complaint asserts his "denial of benefits" was arbitrary and capricious and Defendants address this issue in their Motion for Entry of Judgment, Plaintiff appears to abandon this issue in his response (he only claims that the termination and amendment of the Plan was arbitrary and capricious). Indeed, Plaintiff does not challenge the Defendants' detailed recitation of the procedural history of his claim and its denial other than to argue that he was entitled to documents regarding the policy (as he claims in Count III).

the Plan and Participant Agreements, to the Participants in a single sum distribution."[5]  (Doc. 30, Sec. 5.4).  It is this Section that the Termination Amendment references in providing: "Liquidation of Participant Accounts.  Pursuant to Section 5.4 of the Plan, the present value of the amount credited to the Participant Account shall be distributed to the Participant in a single sum distribution on June 30, 2012."  (Doc. 43, Sec. 2.4).

Plaintiff argues that Defendants' decision to terminate and amend the Plan (as set forth in the Termination Amendment) violates the Section 5.3 of the Plan that provided: "No distribution shall be accelerated because of an amendment or termination of the Plan or Participation Agreement. ... No amendment or termination of the Plan or a Participation Agreement shall reduce the balance credited to the participant's account."  (Doc. 30, Sec. 5.3).  Plaintiff claims that regardless of whether Defendants were allowed to amend or terminate the Plan, they could not reduce "the balance credited" to Plaintiff's account or "accelerate" the distribution.  Plaintiff asserts that this is exactly what happened when Defendants changed the method of valuing Plaintiff's account - namely reducing the "Earned Benefits" as stated on Plaintiff's account information to the NPV of those same benefits.  Plaintiff argues that the NPV amount could not be invested at a rate that would yield the full value of his retirement benefit, that he suffered adverse tax consequences, and he lost the

_____

[5] The circumstances allowing the Company to terminate and distribute the amounts credited to the Participant's Accounts in a single lump sum were: (1) if the Company were to dissolve or with the approval of a bankruptcy court; or (2) "Upon the Company's termination of this and all other account balance plans ... provided that all distributions are made no earlier than twelve (12) months and no later than twenty-four (24) months following such a termination, and the Company doesn't adopt any new account balance plans for a minimum of five (5) years following the date of such termination."  (Doc. 31, Sec. 5.4(b)).  The Court notes that from the text of the Termination Agreement it appears that the Company attempted to amend the Plan such that it needed only to wait three (3) years before adopting a new plan.  (*See* Doc. 43, Sec. 2.4(a)).

13

benefit of the whole life insurance policy that protected his beneficiaries in the event of his death. (Pl.'s Resp. at 13).

Plaintiff argues that this action is similar to *Zervan v. Mayday Construction Co*., 396 F. Supp. 2d 819 (E.D. Mich. 2005). In *Zervan*, the court held that an amendment which changed the date of valuation of benefits when a participant terminated his employment was arbitrary and capricious. *Id*. at 831-32. Before the amendment, if a participant had terminated his or her employment, the value of his or her account was determined as of December 31 of the preceding year. *Id*. at 831. After the amendment, the valuation date was changed to the thirtieth day of the month in which a participant quit. *Id*. It was also undisputed that the amendment was passed after the defendants became aware of "the possible-if not likely-departure of the plaintiff, with the result that the plaintiff would be entitled to less money and the remaining employees, including the plan administrators, would be able to keep more." *Id*. at 832. The *Zervan* court explained that the defendants' conduct in amending the plan "was infused with a conflict of interest, which when considered in light of the timing of the amendment and its obvious adverse effect on the plaintiff and beneficial effect on the administrator's personal financial interest in the plan's assets amounted to an abuse of discretion." *Id*.

Defendants correctly note that *Zervan* involved a funded ERISA plan which is subject to the ERISA provisions concerning fiduciary duties, participation and vesting, to which the Plan in this action is not subject to because of its unfunded status. *See* 29 U.S.C. §§ 1051(2); 1101(1) and Discussion at IV(A), *supra*. Indeed, the *Zervan* court examined the anti-cut back provision, 29 U.S.C. § 1054, which provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan". The court, however, held that the amendment in *Zervan*

14

did not affect an "accrued" benefit under ERISA and did not implicate those statutes. *Id*. at 831. Rather,

> the impact of the amendment on the plaintiff resulted from the manner which his account was valued as of the date to which he became entitled to a distribution. The amendment did not deprive the plaintiff of an accrued benefit ... The reduction in actual value resulted from the poor performance of the plan's investments; all plan members suffered in proportion.

*Id*. Therefore, to the extent Defendants argue that *Zervan* is inapplicable because of its analysis of § 1054, the argument is unavailing. The *Zervan* court held the amendment at issue was arbitrary because the timing (immediately after the plan administrators became aware the plaintiff was likely terminating his account) of the amendment was the product of an obvious conflict of interest and the amendment clearly prejudiced the plaintiff and directly benefitted the plan administrators. *Id*. at 833.

This distinction does not mean that *Zervan* is persuasive on the issue of whether the Defendants' decision to terminate and amend the Plan was arbitrary and capricious. In *Zervan*, the facts were such that it was impossible to conclude the amendment at issue was passed for any reason other than to deprive that particular plaintiff of a portion of his benefits. Moreover, there appears to be no rational reason offered as to why the plan administrators moved the valuation date. In the instant action, Defendants had discretion to amend and terminate the Plan and the ability to distribute the proceeds in a single lump sum. Defendants have also provided a rational reason (and the calculation of an actuary) to support the decision to distribute the NPV of all the Plan accounts.

The Court must uphold a plan administrator's decision under the arbitrary and capricious standard if the administrative record can support a "reasoned explanation" for the decision.

15

*Williams*, 227 F.3d at 712 (6th Cir. 2000). Under this standard, an administrator's claim can be overturned only "upon a showing of internal inconsistency, bad faith, or some similar ground." *Racknor v. First Allmerica Fin. Life Ins. Co.*, 71 F. Supp.2d 723, 729 (E.D. Mich. 1999) (citing *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 695 (6th Cir. 1989). "If the plan administrator's decision is rational in light of the plan's provisions and reasonable with no abuse of discretion, then it must be upheld." *Id.* Here, Defendants set forth that the NPV calculation is rational and consistent with the terms of the Plan because it is the product of an actuary. Further, Defendants argue that without this adjustment Plaintiff would have received a larger benefit than he was entitled to before the Termination Amendment, because Plaintiff's request for the earned benefits "fails to account for the time value of money."[6] (Defs.' Br. at 13).

The Court finds Defendants' arguments persuasive. While it is true that Defendants' decision to distribute the NPV of the participant accounts appears to have benefitted the Defendants because, as Plaintiff asserts, they deposited the difference in their coffers, it was a rational business decision and supported by actuarial science. The Plan and Participation Agreement provided that Plaintiff would receive his account balance nine years in the future and over the course of ten years. It appears rational to distribute the "actuarial equivalent" of the account balance to participants in a lump sum payment. *See Oster v. BARCO of California Employee's Retirement Plan*, 869 F.2d 1215, 1217 (9th Cir. 1989) (finding that the participant was not complaining about a reduction in

---

[6] To the extent Plaintiff argues extensively that Defendants' termination and amendment of the Plan breached their fiduciary duties, this argument is without merit. As examined *supra*, the ERISA provisions regarding fiduciary duties do not apply to this unfunded Plan. Further, as Defendants' correctly note, the Sixth Circuit has held a company does not act in a fiduciary capacity when it decides to amend or terminate a benefits plan (absent a violation of law). *See Sutter v. BASF Corp.*, 964 F.2d 556, 562 (6th Cir. 1992).

benefits but the form in which he would receive his benefits when he requested a "lump-sum distribution of the actuarial equivalent of his accumulated benefit" because whether the participant "received his benefits in the form of an annuity or a lump-sum distribution, the amount paid to him *would be actuarially equivalent*.") (emphasis added); *see also Conkright v. Frommert*, 559 U.S. 506, 519 (criticizing an interpretation of a benefits plan that did "not account for the time value of money. In the actuarial world, this is heresy, and highly unforeseeable.") (internal citation omitted).

Additionally, the Court recognizes that while there is a conflict of interest present in this case, it is but one factor for the Court to consider. *See Firestone*, 489 U.S. at 115. The Supreme Court has explained: "we believe that *Firestone* means that the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which conflict of interest is one." *Glenn*, 554 U.S. at 117. A conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administration has a history of biased claims administration." *Id*. (citation omitted). In contrast, a conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id*.

Unlike *Zervan*, where the actions of the plan administrators were obviously directed at disadvantaging one single plan participant who was terminating his benefits, the actions of the instant Defendants are not so clearly one-sided where Plaintiff received the actuarial equivalent of

17

his total benefits.  Moreover, the plan administrators in *Zervan* could not justify their actions with any rational purpose.  The Court notes that in the Final Benefits Determination Letter, Defendants recognized the conflict of interest that existed between the plan sponsor and plan administrator and stated that it made a good faith attempt to reduce the potential bias by "1) sheltering the committee members from potential adverse employment actions; 2) appointing individuals who had not participated in the Plan; 3) providing Claimant the opportunity to directly present his appeal to the Appeal Committee; and 4) having an outside independent actuary review the computations." (Doc. 4, FN 18).

For all these reasons, the Court finds Defendants' decision to amend and terminate the Plan was not arbitrary or capricious.

## C.    Procedural Challenge

In Count III of his complaint, Plaintiff argues that Defendants violated his procedural right to a full and fair review under 29 U.S.C. § 1133 when he was not provided with a copy of the Policy and other similar documents or correspondence regarding the Policy.[7]  (Comp. ¶¶ 46-58; Doc. 67). Plaintiff claims that because he was not provided with these documents, he was denied a full and

---

[7] Section 1133 provides:

In accordance with regulations of the Secretary, every employee benefit plan shall –

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

fair review.  Plaintiff then requests limited discovery on this issue to determine "how much weight to accord to the conflict of interest."[8]  (Compl. ¶ 58).

The Plan provided that "[e]ither a person whose claim for benefits under this Plan has been denied or his duly authorized representative (1) may request a review upon written application to the Company; (2) may review pertinent documents; and (3) may submit issues and comments in writing."  (Doc. 34, Sec. 6.9).  Plaintiff asserts that he requested a copy of the Policy, documents relating to the Policy or similar accounts, and also:

> copies of all emails, correspondence, letters, correspondence, memorandum or writing of any type between the Company and its representatives and the representatives of Northwestern Insurance Company or other entity or organization which established or purported to establish an account balance, annuity contract, life insurance product, saving account, investment account, bank account which the Company made payments or contributions to for and on behalf of Collins or any other Plan participant.  This written material should include all documents dealing with the establishment of the Plan or accounts for Collins or any other Plan Participant, periodic investment reports, invoices to the Company, contribution acknowledgments, actuarial determinations, interest calculations, interest adjustments, termination of the Plan, the manner in which account balances are calculated, the payment or reimbursement to the Company of any proceeds from the Collins accounts or the accounts of any other Plan Participants upon termination of the Plan and the liquidation of accounts occurring on or about June 30, 2012, legal opinions regarding the manner of distribution of accounts to Plan Participants and to the Company upon Plan liquidation.

(Docs. 67-68).  Defendants did not supply this information and did not reference the request in its Initial Review Determination which denied Plaintiff's request for benefits.  (Docs. 73-74).  Plaintiff again made these requests in his appeal from the Initial Determination.  (Docs. 79-80).  In the Final Benefits Determination Letter, Defendants addressed Plaintiff's request for documents and stated that "[t]o the extent that the Claimant has requested other documents we find those not to be

---

[8] Plaintiff does not challenge any other part of the claims procedure, and the Court notes that Defendants followed the claims procedure as it was set forth in the Plan.

pertinent." (Doc. 12). Defendants then explained that those documents were either privileged, had no bearing on the terms of the Plan or Termination Amendment (because those terms were set forth in the Plan and the Termination Amendment), or were not pertinent because Section 6.1 of the Plan stated Plaintiff had no right, interest, or title to the Policy referenced. (Docs. 12-13).

Plaintiff argues that limited discovery is required here because his claim represents a procedural challenge to the administrator's decision based on an alleged bias. Plaintiff claims that "this case arises out of a suspicious and irregular set of circumstances. ... The company withdrew all of the funds from the [Policy] account, deposited the funds into its own account, and then retained a portion of the funds for itself after re-valuing Collin's retirement account." (Pl.'s Resp. at 21). Plaintiff's allegations of impropriety hinge on this Court finding that Plaintiff had an interest or claim to the Policy and also that the Plan was "funded" by the Policy. If these facts were true, Defendants' treatment of the Policy might be pertinent to Plaintiff's claim for benefits and in turn the documents requested by Plaintiff might be pertinent. However, pursuant to the plain terms of the Plan, Plaintiff did not have a title, interest, or right to the Policy or any other account that may have covered the cost of his benefits and the Plan (as explained *supra*) was explicitly unfunded. (Doc. 31-32, Sec. 6.1).

Therefore, Plaintiff's claim that he is entitled to know more about the Policy is not persuasive. Additionally, Plaintiff's argument assumes that the NPV of his account balance constitutes a reduced benefit. The Court, however, finds that the NPV of Plaintiff's credited account balance is the "actuarially equivalent" of the deferred benefit he would have received in the future. As a result, Plaintiff's argument that Defendants were "advantaged" at the expense of Plaintiff and his argument regarding an overriding conflict of interest loses its credibility.

20

In *Wilkins*, the Sixth Circuit held that in reviewing the merits of a denial of ERISA benefits case a court is limited to evaluating the administrative record.  *Wilkins*, 150 F.3d at 615.  However, the Sixth Circuit recognized an exception to that rule, when evidence outside the record "is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part."  *Id.* at 619 (Gilman, J., concurring). Plaintiff argues that here there is an obvious bias on the part of Defendants such that limited discovery should be allowed regarding the Policy and the documents Plaintiff previously requested. However,

> [t]he limitation on discovery recognized in *Wilkins* is a result of the determination that matters outside the administrative record are ordinarily not relevant to the court's review of an ERISA benefit decision.  District courts are well-equipped to evaluate and determine whether and to what extent limited discovery is appropriate in furtherance of a colorable procedural challenge under *Wilkins*.

*Johnson v. Connecticut Gen. Life Ins. Co.*, 324 Fed. App'x 459, 467 (6th Cir. 2009).  As explained earlier, the facts in this case do not support limited discovery on the Policy (to which Plaintiff has no right, title or interest) because Defendants' decision did not disadvantage Plaintiff who received the "actuarially equivalent" of his credited account balance.  Therefore, the Court denies Plaintiff's request for limited discovery and also finds Plaintiff's claim of a procedural challenge to the Plan Administrator's decision is without merit.

21

**IV. CONCLUSION**

For all these reasons, the Court GRANTS Defendant's Motion for Entry of Judgment,

Upholding the Plan Administrator's Decision (Dkt. No. 6) and DISMISSES Plaintiff's Complaint

with prejudice.

SO ORDERED.


s/Paul D. Borman_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 10, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party
of record herein by electronic means or first class U.S. mail on June 10, 2014.


s/Deborah Tofil_____
Case Manager

22